UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

COLLIER HMA PHYSICIAN
MANAGEMENT, LLC, and NAPLES
HMA, LLC,

       Plaintiffs,

v.                                                          Case No. 2:18-cv-408-SPC-MRM

NCH HEALTHCARE SYSTEM, INC.,
NAPLES COMMUNITY HOSPITAL,
INC., and NCHMD, INC.,

       Defendants.

_____/

### DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION TO EXCLUDE THE OPINIONS OF EXPERT EVAN STARR, PH.D.

Plaintiffs' Motion to Exclude the Opinions of Defendants' Expert Evan Starr, Ph.D. (Doc. 192) (the "Motion") should be denied because Dr. Starr is a highly qualified public policy expert whose testimony is both reliable and helpful. Contrary to Plaintiffs' lead and primary argument in their Motion ("unenforceability of the restrictive covenant … is of no legal relevance to Plaintiffs' claims" (Doc. 192, pp. 2 and 6-9)), the unenforceability of a contract is extremely relevant to claims for interference when the contract is unenforceable because it is "unlawful or contrary to public policy," which is the subject of Dr. Starr's testimony. "When a contract is unlawful or contrary to public policy, the contract is void *ab initio*, and a claim for tortious interference with that contract is not actionable." *People for the Ethical*

*Treatment of Animals Inc. v. Dade City's Wild Things, Inc.,* 2017 WL 10299577, at *3 (M.D. Fla. July 14, 2017); *see also* Restatement (*Second*) of Torts § 774, cmt. b. (1979).

Moreover, separate, apart, and independent of the relevance of Dr. Starr's testimony to whether the restrictive covenant[1] is enforceable, his testimony is also relevant to Defendants' Third Affirmative Defense, which alleges "justification" because "Defendants' actions advanced societal interests related to protecting freedom of action between patients and their physicians." To be actionable, interference must be "intentional *and unjustified*." *Duty Free Ams., Inc. v. Estee Lauder Cos., Inc.*, 797 F. 3d 1248 (11th Cir. 2015) (citing *Ethan Allen, Inc. v. Georgetown Manor, Inc.,* 647 So. 2d 812 (Fla. 1995)). Dr. Starr's testimony explains how Defendants' actions were "justified" because they "advanced societal interests," which will be helpful to the trier of fact.

Florida Statute, Section 542.335(g)(4), requires the Court, when "determining the enforceability of a restrictive covenant," to consider "the effect of enforcement upon the public health, safety, and welfare." The "effect of enforcement" is also relevant to the issue of "justification." Dr. Starr's area of expertise includes the impact and effect of restrictive covenants on public health, safety, and welfare. He is so highly qualified that Plaintiffs have not challenged his qualifications in the Motion. As explained more fully below, his testimony is both reliable and helpful in determining

---

[1] The terms "restrictive covenant" and "noncompete agreement" were used interchangeably by the parties. The term "restrictive covenant" is used herein for simplicity and clarity.

disputed issues in this case. For these reasons, and others, the Motion should be denied.

## The Opinions at Issue

Dr. Starr's opinions are fully set forth in his Amended and Supplemental Report dated July 30, 2021 (Doc. 192-1) (the "Supplemental Report") and in his two depositions. (Docs. 192-2 & 192-3).[2] Prior to this Court ordering Plaintiffs to produce substantial, additional data and documents, Dr. Starr issued reports dated June 1, 2020 and July 23, 2020[3] (collectively, the "Original Reports"), which accurately reflected his opinions as of those dates. After Plaintiffs produced the data and documents ordered by this Court, Dr. Starr included this additional evidence in his Supplemental Report. Therefore, the totality of Dr. Starr's opinions are included in his Supplemental Report and can be summarized generally as follows:

a.  Enforcing Plaintiffs' restrictive covenant would cause harm to the public;

b.  Plaintiffs' restrictive covenant does not protect Plaintiffs' physician-patient relationships; and

c.  The harmful public policy effects of the restrictive covenant outweigh the need to protect any interests of Plaintiffs.

---

[2] Dr. Starr's errata sheet relating to his deposition taken October 8, 2021, is attached as Exhibit A.

[3] Dr. Starr's original report was amended on July 23, 2020 to account for the deposition testimony of Dr. Joseph Stafford (6/8/20), Scott Campbell (6/12/20), Dr. Brian Murphey (6/15/20), Scott Phillips (6/19/20), Dr. Natasha Choyah (6/22/20), Larry Farese (6/24/20), Dr. Allan Weiss (7/2/20), Dr. Carlos Portu (7/7/20), HMA's corporate representative (7/17/20), and Zachary Bostock (7/21/20).

## STANDARD OF REVIEW

This Court previously established the standard of review when considering the admissibility of expert testimony in *Continental 332 Fund, LLC v. Kozlowski*, 2020 WL 1234808, at *6 (M.D. Fla. Mar. 13, 2020). The starting point is Federal Rule of Evidence 702, which states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

*See* FED. R. EVID. 702; *Continental 332 Fund*, 2020 WL 1234808 at *6. This Court has "a gatekeeping function designed to test expert evidence for relevance and reliability." *Continental 332 Fund*, 2020 WL 1234808 at *6. Courts should apply a "'rigorous three-part inquiry' by considering whether (1) the expert is qualified to testify competently about the issues at hand, (2) the expert's methodology is reliable enough, and (3) the expert's testimony helps the trier of fact understand the evidence or determine a factual issue." *Id.* (citing *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004)).

Boiled down to its simplest form, to be admissible, an expert must be qualified, and his opinion must be reliable and helpful. "The party offering the expert has the burden of satisfying each of these three elements by a preponderance of the evidence." *Id.* (quoting *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1292 (11th Cir. 2005)). "The admission of expert testimony is a matter within the discretion of the district court, which is accorded considerable leeway in making its determination." *Perry v.*

*Schumacher Grp. of La.,* 2020 WL 7090751, at *2 (M.D. Fla. Dec. 4, 2020) (citing *Frazier*, 387 F.3d at 1258). However, "the rejection of expert testimony is the exception rather than the rule." FED. R. EVID. 702 advisory committee's note to 2000 amendment.

Additionally, care must be taken to distinguish between admissibility of evidence and sufficiency of evidence. Admissibility is a threshold inquiry for the Court, but sufficiency is an issue reserved for the trier of fact. *See Pinchinat v. Graco Children's Prods., Inc.*, 2005 WL 5960928, at *2-3 (M.D. Fla. Apr. 7, 2005). As explained below, Dr. Starr's opinions in this case more than meet the standards set forth in Rule 702 and interpretive case law.

## ARGUMENT

Importantly, Plaintiffs do not challenge Dr. Starr's <u>qualifications</u> to serve as an expert on public policy. Plaintiffs challenge the <u>helpfulness</u> and <u>reliability</u> of his opinions, two parts of the Court's "rigorous three-part inquiry." *See Continental 332 Fund,* 2020 WL 1234808 at *6. Contrary to Plaintiffs' arguments, Dr. Starr's opinions are <u>helpful</u> because they are relevant to the allegations. (Doc. 192, pp. 2-3). Dr. Starr's opinions are also <u>reliable</u> because his methodology is based on scientific literature and empirical analyses. (*Id.*).

### I. DR. STARR'S OPINIONS ARE HELPFUL, AND THEY WILL ASSIST THE TRIER OF FACT.

To be relevant, an expert's testimony must "help the trier of fact to understand the evidence or to determine a fact in issue." FED. R. EVID. 702(a). "By this

requirement, expert testimony is admissible if it concerns matters that are beyond the understanding of the average lay person." *Frazier*, 387 F.3d at 1262.

## A. DR. STARR'S OPINIONS ARE RELEVANT TO DISPUTED ISSUES IN THE CASE.

### 1. Dr. Starr's opinions are relevant and helpful in determining the enforceability of the PRMC Noncompete.

Plaintiffs argue that "unenforceability of the restrictive covenant … is of no legal relevance to Plaintiffs' claims." (Doc. 192, pp. 2, 6-9). In support of this argument, Plaintiffs rely primarily upon *United Yacht Brokers, Inc. v. Gillespie*, 377 So. 2d 668, 672 (Fla. 1979),[4] which involved a brokerage contract rendered unenforceable due to a failure to comply with a technical requirement governing formation. Specifically, the brokerage agreement in that case was unenforceable because the broker did not have "written authorization from his principal," as required by a special statute.

In sharp contrast, this case does not involve a technical defect in the formation of a contract. Rather, Defendants claim that the Restrictive Covenant is void because it violates public policy, and, therefore, the formation technicalities mentioned in *United Yacht Brokers* and the legal reasoning in *United Yacht Brokers* have no applicability in this case. Indeed, Florida courts dealing with contracts void as against public policy have expressly "distinguished *United Yacht Brokers* and its progeny because those cases

---

[4] Other cases relied upon in Plaintiffs' Motion either directly cite to *United Yacht Brokers* or cite to a case that cites *United Yacht Brokers*. *See Border Collie Rescue, Inc. v. Ryan*, 418 F. Supp. 2d 1330, 1344 (M.D. Fla. 2006) (citing *United Yacht Brokers*); *Grupo Televisa, S.A. v. Telemundo Commc'ns Grp., Inc.*, 485 F.3d 1233, 1243 (11th Cir. 2007) (citing *Border Collie* and *United Yacht Brokers*).

involved contracts that were voidable, not void." *Gulfstream Park Racing Ass'n, Inc v. Tampa Bay Downs, Inc.,* 294 F. Supp. 2d 1291, 1305-06 (M.D. Fla. 2003); *see also Thomas v. Ratiner,* 462 So. 2d 1157, 1160 (Fla 3d DCA 1984) ("No such cause of action lies for interference with a contract void as against pubic policy…."). In *People for the Ethical Treatment of Animals*, the court cited *Gulfstream Park* and *Thomas* for the proposition that: "*When a contract is unlawful or contrary to public policy, the contract is void ab initio and a claim for tortious interference with that contract is not actionable*." 2017 WL 10299577, at *3 (emphasis added).

Furthermore, Florida's rejection of tortious interference claims based upon contracts that are void as against public policy is set forth in opinions of the Eleventh and Fifth Circuits, as well as the Restatement (Second) of Torts. *See Yanakakis v. Chandris, S.A.*, 9 F.3d 1509, 1513 (11th Cir. 1993) ("In Florida, a contract is void and cannot be the source of rights if either the formation or the performance of the contract is criminal, tortious, or otherwise opposed to public policy."); *Gulfstream Park Racing Ass'n, Inc. v. Tampa Bay Downs, Inc.*, 479 F.3d 1310, 1312 n.4 (11th Cir. 2007) ("We also agree with the district court that Gulfstream's claims for intentional interference with advantageous business relationships . . . cannot be maintained when the contract interfered with or breached was void *ab initio*."); *see also Sunbeam Corp. v. Masters of Miami, Inc.*, 225 F.2d 191, 198 (5th Cir. 1955); *Brunswick Corp. v. Vineberg*, 370 F.2d 605, 610 n. 6 (5th Cir. 1967); *Restatement (Second) of Torts* § 774, cmt. b (1979) ("Illegal

agreements and those in violation of public policy are commonly held to be entirely

void . . . and there is no liability for causing their breach.").

Accordingly, Plaintiffs cannot maintain a claim for tortious interference if the

underlying contract is void as against public policy.  Therefore, Dr. Starr's testimony

relating to public policy considerations that may render the restrictive covenant void

are extremely relevant and will be helpful to the Court and jury.

**2. Dr. Starr's opinions are also relevant and helpful in determining whether Defendants' actions were "justified" as claimed in Defendants' Third Affirmative Defense.**

Dr. Starr's opinions on the injurious impact of Plaintiffs' restrictive covenant on

the community directly support Defendants' Third Affirmative Defense, which states:

> Plaintiffs cannot maintain any form of claim for unfair competition or tortious interference with either a contract or business relationship, either independently or as an underlying tort for an alleged conspiracy, because Defendants' actions ***advanced societal interests*** related to ***protecting freedom of action between patients and their physicians***, which the law deems to be of equal or greater value than the contractual or legal rights allegedly infringed by Defendants' actions; hence, Defendants' alleged ***conduct was justified and privileged***.

(Doc. 47, pp. 14-15) (emphasis added). Notably, Plaintiffs have not moved for

summary judgment on the Third Affirmative Defense (Doc. 194), and Plaintiffs' unfair

competition and tortious interference claims remain at issue. (Doc. 44).

To be actionable, interference must be both "intentional and unjustified." *Duty*

*Free Ams.,* 797 F. 3d at 1248 (citing *Ethan Allen,* 647 So. 2d at 812). "A cause of action

for tortious interference requires a showing of both an intent to damage the business

relationship and a lack of justification to take the action which caused the damage."

*Networkip, LLC v. Spread Enters., Inc.*, 922 So. 2d 355, 358 (Fla. 3d DCA 2006); *see also Quintana v. Am. Sec. Ins. Co.*, 2013 WL 5177882, at *2 (M.D. Fla. Sept. 12, 2013).

Here, if the Court finds that interference occurred, Defendants contend that their actions were justified, in part, because the interference was necessary to advance societal interests. (Doc. 47, pp. 14-15). Dr. Starr's opinions will help the jury understand how the enforcement of Plaintiffs' restrictive covenants would have severely impacted the public's health, safety, and welfare, thereby justifying Defendants' actions. If Defendants' actions were justified, they cannot be liable for tortious interference. *See Barco Holdings, LLC v. Terminal Inv. Corp.*, 967 So. 2d 281 (Fla. 3d DCA 2007) (holding the defendant's interference was justified to preserve the community's use of parking facilities on Fisher Island).

## B. DR. STARR'S OPINIONS ARE NOT LEGAL CONCLUSIONS.

Contrary to Plaintiffs' characterization, Dr. Starr has not offered any opinions regarding the proper interpretation or application of Florida law. Dr. Starr is not applying the law to opine whether Defendants are civilly liable for Plaintiffs' alleged offenses, as was the case in *In re 3M Combat Arms Earplug Prods. Liab. Litig.*, 2021 WL 765019, at *40 (N.D. Fla. Feb. 28, 2021) and *Mamani v. Sanchez Berzain*, 2018 WL 1090546, at *6 (S.D. Fla. Feb. 28, 2018), which Plaintiffs relied on in the Motion.

Instead, Dr. Starr opines that enforcement of Plaintiffs' restrictive covenant, using the specific facts of this case, is detrimental to the public's health, safety, and welfare, and therefore, the restrictive covenant is void as against public policy as permitted by Florida Statute § 542.335. In justifying his opinion, it was necessary for

Dr. Starr to use Florida law as guideposts, so the jury understands the confines from which his opinions are based, which is a permitted use of the law. *See Action Nissan, Inc. v. Hyundai Motor Am.*, 2020 WL 9173027, at *2 (M.D. Fla. Nov. 5, 2020) (finding the expert "simply stated his understanding of the facts relevant to his opinion or offered legal assumptions that place his opinion in context, either of which he is plainly permitted to do"); *Regions Bank v. Kaplan*, 2017 WL 1148309, at *2 (M.D. Fla. Mar. 24, 2017) ("When the relevant professional practices and standards have been shaped by the law, … the expert may refer to legal principles or assumptions to place his opinions in context."); *see also Claussen v. Powersecure, Inc.*, 2019 WL 4941109, at *8 (M.D. Ala. Oct. 7, 2010) ("passing reference to a legal principle or assumption in an effort to place [the expert's] opinions in some sort of context will not justify the outright exclusion of the expert's [testimony]").

Dr. Starr's public policy opinions, completely untethered from legislative considerations and a historical perspective of restrictive covenants, would be useless and misleading. Dr. Starr cannot legitimately opine that Plaintiffs' restrictive covenant violates public policy without an explanation of the public policy considerations restrictive covenants are designed to protect. Moreover, the jury cannot and should not accept bald assertions that the restrictive covenant violates public policy. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 137 (1997) ("Nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."); *see also Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cty., Fla.*, 402 F.3d 1092, 1111 (11th Cir. 2005). An explanation of

Dr. Starr's qualifications, experience, research, and understanding of legislative history is necessary to fully appreciate the weight and authority behind his opinions.

While Dr. Starr discusses the "legitimate business interests" that generally underpin an employer's use of restrictive covenants, that discussion is necessary to understand the public policy considerations surrounding the specific "legitimate business interests" that Plaintiffs allege with regard to the restrictive covenant in this case and whether public policy considerations outweigh those interests.  Furthermore, an expert is permitted to testify regarding the ultimate issue. *See* FED. R. EVID. 704(a); *see also Hanson v. Waller*, 888 F.2d 806, 812 (11th Cir. 1989) ("To be admissible under rule 704, an expert's opinion on an ultimate issue must be helpful to the jury and also must be based on ***adequately explored legal criteria***.") (Emphasis added).

### C.   DR. STARR'S REPORT IS NOT MISLEADING AS ALLEGED BY PLAINTIFFS.

#### 1.  His opinions are not based on "speculation."

Dr. Starr's opinions combine his education, training, experience, academic literature, and empirical analysis with record evidence to determine if the public would have been harmed had the physicians complied with Plaintiffs' restrictive covenant. Because some physicians complied with the restrictive covenant (left town, sat out, or worked elsewhere), Dr. Starr had to make some assumptions as to what would have happened in the community if the physicians at issue in this case had also complied with the restrictive covenant (i.e., refused to be employed by Defendants). However, those assumptions are based upon empirical analysis (Doc. 192-1, pp. 26-52) and

record evidence, as reflected in the Motion, as well as Dr. Starr's education and experience, and those assumptions are acceptable under *Daubert*. *See McSwain v. World Fuel Servs. Corp.*, 2021 WL 2682269, at *4 (S.D. Fla. June 30, 2021) ("Florida federal courts permit expert opinion testimony on damages even though the opinions are based on assumptions if there is a factual foundation for the assumptions."); *In re Seroquel Prods. Liab. Litig.*, 2009 WL 3806435, at *8-10 (M.D. Fla. June 23, 2009) (holding that expert's inference of cause and effect is sufficiently reliable even when an exact cause is unknown).

### 2. Dr. Starr's consideration of lay witness testimony is appropriate, helpful, and necessary.

An expert may "explain[ ] the basis of admissible opinions through commentary on documents and exhibits in evidence." *Arevalo v. Coloplast Corp.*, 2020 WL 3958505, at *21 (N.D. Fla. July 7, 2020); *see Ohio State Troopers Ass'n, Inc. v. Point Blank Enters., Inc.*, 2020 WL 1666763, at *15-16 (S.D. Fla. Apr. 3, 2020) (an expert may narrate testimony "which may be necessary to provide the facts supporting his opinions"). Like the expert in *In re 3M Combat Arms Earplug*, relied on by Plaintiffs in the Motion, Dr. Starr used record evidence to "explain the factual underpinnings of [his] admissible opinions." 2021 WL 765019 at *41 (holding "[t]he court will not issue a 'blanket ban' on discussions of internal documents and declines to parse the experts' reports and depositions for statements that may cross the line into improper factual narration").

To understand how the restrictive covenants in this case would affect the physician-patient relationship, it is necessary for Dr. Starr to incorporate record

evidence into his analysis. He is not merely parroting witness testimony but demonstrating what would have happened based partly upon the preferences revealed by the named physicians in this lawsuit (that being their preference to remain in the community to serve their patients) and partly on what other physicians employed by Plaintiffs decided to do. *See Altidor v. Carnival Corp.*, 2021 WL 3163650, at *8 (S.D. Fla. July 27, 2021) (declining to exclude expert opinion where expert "sufficiently explained that his opinions are based on the evidence provided to him…, various industry materials…, his substantial education, and his extensive practical experience").

For example, Plaintiffs argue that Dr. Starr's testimony about severed patient relationship caused by physicians leaving town or otherwise not working in the community is "pure conjecture, unmoored from any evidence in this case." (Doc. 192, pp. 16-17). In fact, Dr. Starr discusses voluminous evidence to support his opinions, including how many physicians left Plaintiffs' employment after the acquisition, and how many primary care physicians left. (*See* Doc. 192-1, pp. 39-40).

Moreover, rather than attack admissibility, Plaintiffs' arguments go to the weight to be given to Dr. Starr's opinions. "Any weaknesses in the underpinnings of the expert's opinion go to its weight rather than its admissibility." *Se. Metals Mfg. Co., Inc. v. Fla. Metal Prods., Inc.*, 778 F. Supp.2d 1341, 1344 (M.D. Fla. 2011) (citing *Jones v. Otis Elevator Co.*, 861 F.2d 655, 663-64 (11th Cir. 1988)); *see also Silcox v. Hunter*, 2018 WL 3633251, at *11 (M.D. Fla. July 31, 2018); *Quiet Tech. DC-8*, 326 F.3d at 1345 ("in most cases, objections to the inadequacies of a study are more appropriately

considered an objection to the weight of the evidence rather than its admissibility")
(quoting *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1188 (9th Cir. 2002)). "A less-
than-perfect expert opinion may still be admitted, even if it contains gaps." *McSwain*,
2021 WL 2682269 at *4 (citing *In re Trasylol Prod. Liab. Litig.*, 2010 WL 1489793, at *6
(S.D. Fla. Feb. 24, 2010) ("Only if the expert's opinion is so fundamentally
unsupported that it can offer no assistance to the jury must such testimony be
excluded.")).

Dr. Starr's opinions, including his assumptions, are admissible because his
opinions are based, in part, upon what would have happened if the named physicians
had complied with the restrictive covenant, and either left the community or joined a
concierge practice. Plaintiffs can vigorously cross-examine Dr. Starr's methodology
and opinions. *See Quiet Tech. DC-8*, 326 F.3d at 1345; *McSwain*, 2021 WL 2682269 at
*5 ("[The expert] based his assumptions on what [the plaintiff] told him and on the
exhibit[s].… Because those assumptions appear to have some factual basis, they
should not now be excluded. They may, of course, be vigorously attacked at trial
during cross-examination.") (citation omitted).

Lastly, Plaintiffs argue that Dr. Starr's testimony is irrelevant because Florida
Statute § 542.335, requires the *Court* to decide issues of public policy, and the Court
does not need the assistance of expert testimony to reach its decision. However,
contrary to Plaintiffs' argument, this case involves mixed issues of law and fact to be
decided by the jury. *See Schumann v. Collier Anesthesia, P.A.*, 2017 WL 1207263 (M.D.

Fla. Apr. 3, 2017). Regardless, Dr. Starr's expert testimony is relevant to help the Court or jury understand the public policy implications of the restrictive covenant.

## II.   DR. STARR'S METHODOLOGY IS RELIABLE.

Plaintiffs argue that Dr. Starr's opinions should be stricken because his "methodology is unreliable because he did not conduct any empirical analyses to reach his conclusions." (Doc. 192, p. 3). Plaintiffs also contend that his reliance on record evidence is improper. (*Id.* at pp. 21-23). However, Dr. Starr's opinions are reliable because they are based on his experience, extensive academic literature, empirical evidence, and are supported by the record in this case. (Doc. 192-1).

"Exactly how reliability is evaluated may vary from case to case…." *Frazier*, 387 F.3d at 1262; *see Tardif v. People for the Ethical Treatment of Animals*, 2011 WL 6005280, at *3 (M.D. Fla. Dec. 1, 2011). The Supreme Court in *Daubert* provided a list of factors to guide courts in assessing the reliability of expert opinions, but "these factors do not exhaust the universe of considerations that may bear on the reliability of a given expert opinion, and a federal court should consider any additional factors that may advance its Rule 702 analysis." *Quiet Tech. DC-8, Inc.* 326 F.3d at 1341.

Indeed, excluding evidence based on unreliability is the exception and not the rule. *See Joiner*, 522 U.S. at 140 ("the Federal Rules of Evidence governing expert testimony display a preference for admissibility"). Courts must be careful not to conflate the question of admissibility with the weight to be accorded to the testimony by the fact finder. *Quiet Tech. DC-8,* 326 F.3d at 1341. Instead, "[v]igorous cross-

examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* (quoting *Daubert*, 509 U.S. at 596); *see Perry*, 2020 WL 7090751 at *2.

### Dr. Starr's "methodology"

Dr. Starr's opinions and the basis for them are set forth in detail in his Supplemental Report and deposition testimony. (Docs. 192-1, 192-2, & 192-3). In summary, Dr. Starr's methodology included the following three steps:

In <u>step one</u>, Dr. Starr identified the general public policy concerns related to the enforcement of physician restrictive covenants by examining extensive academic literature in the field of medicine. (Doc. 192-1, pp. 6-26). By doing this, Dr. Starr was able to identify four main areas of concern on how restrictive covenants effect public health, safety, and welfare: (i) sever physician-patient relationships; (ii) exacerbate physician shortages; (iii) lower quality of care; and (iv) increase prices. (*Id.* at 15-16).

In <u>step two</u>, Dr. Starr generally assessed the extent of these public policy concerns by analyzing academic literature and empirical evidence on the effects to public health, safety, and welfare when restrictive covenants are enforced or voided. (*Id.* at 26-31).

Finally, in <u>step three</u>, using the analyses in the academic literature, Dr. Starr conducted an empirical analysis by applying Plaintiffs' data on patient-physician relationships, testimony from witnesses, and documents produced by Plaintiffs, to the four public policy concerns identified in steps one and two in order to determine his

opinions on the effect of Plaintiffs' specific restrictive covenant to the public health, safety, and welfare of this community.

Dr. Starr's reliance on his experience, academic literature, empirical evidence, and the record is an acceptable methodology. For example, in *Perry*, Dr. Pamela Perry was an African American female emergency room physician employed by Naples HMA, LLC ("HMA"). 2020 WL 7090751 at *1. Dr. Perry sued HMA and the healthcare staffing service company alleging various discrimination and retaliation claims. *Id.* Defendants challenged the methodology employed by Dr. Perry's expert who opined on the detrimental impact the termination had on Dr. Perry's career and future earnings. *Id.* This Court found the expert's testimony sufficiently reliable although the opinions were based on:

> (1) patient satisfaction scores and email correspondence about the scores collected during plaintiff's tenure [ ], (2) his knowledge of emergency room key metrics and the tenure of medical doctors meeting those metrics, (3) a review of the current online roster of emergency room physicians working for HMA, and (4) research into emergency rooms located within a 'suitable geographic location' for plaintiff and their staffing numbers.

*Id.* at *4.

In reaching the conclusion in *Perry*, this Court relied on *Goines*. In *Goines*, the plaintiff sued Lee Memorial Health Systems ("Lee Health") alleging common law negligence. 2019 WL 1101878 at *1. In defense, Lee Health retained an expert to "address the issue of the standard human resource practices for conducting background screenings, hirings, and supervising and investigating employees." *Id.* Lee Health's experts analyzed the hospital's policies and the depositions taken in the case,

as well as published articles and literature such as from the Equal Employment Opportunity Commission and the Society for Human Resource Management. *Id.* at *6. Then, to reach their opinions, they applied the record evidence and literature to their years of experience. *Id.* at *1. The plaintiff argued that the experts "utilized [ ] unreasonable methodology[ies]" and instead made "bare-bone assertions." *Id.* at *6. However, this Court disagreed, finding that the experts' experience and education, coupled with the literature and facts from the case, was a sufficiently reliable method to ascertain their opinions. *Id.*

As in *Perry* and *Goines*, Dr. Starr's education and experience, combined with his extensive academic research and application of the empirical evidence to the specific testimony and facts presented in this case, are more than sufficient to meet the standard set forth in *Daubert*.

### III.   DR. STARR'S OPINIONS SHOULD NOT BE EXCLUDED UNDER FED. R. EVID. 403.

"Exclusion under Rule 403 is appropriate if the probative value of otherwise admissible expert testimony is substantially outweighed by its potential to confuse or mislead the jury, or if the testimony is cumulative or needlessly time consuming." *Hendrix v. Evenflo Co., Inc.*, 255 F.R.D. 568, 579 (N.D. Fla. 2009) (citing *Hull v. Merck & Co., Inc.*, 758 F.2d 1474, 1477 (11th Cir. 1985)). But the court's gatekeeping function "is not intended to supplant the adversary system or the role of the jury." *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1312 (11th Cir. 1999). Only the jury may

determine "where the truth in any case lies" and the court "may not usurp this function." *Frazier*, 387 F.3d at 1272.

A public policy exception is expressly incorporated in Florida Statute § 542.335. As such, Dr. Starr's opinions regarding public policy in relation to Plaintiffs' restrictive covenants has substantial probative value. Plaintiffs' concerns that Dr. Starr's testimony will "inflame the jurors and paint Plaintiffs' as villains who treat their doctors poorly" is misplaced. Dr. Starr did not cause Plaintiffs' behavior that led to the mass exodus of physicians in 2014 and 2015; Dr. Starr merely relied on the testimony to support his findings and opinions. (Exs. 143, p. 2; 267; 401; Lowe Dep. 124:1-125:5, July 17, 2020). The physicians' sworn testimony will demonstrate to the jury why the physicians were desperate to terminate their relationship with Plaintiffs:

> Brian Menichello: "We were at our breaking point . . ." and "We didn't have a choice . . . We knew there was no way we could continue to stay at Physicians Regional." (B. Menichello Dep. 94:13-16, 100:14-23; *see also* 183:9-198:7);

> Monica Menichello: Q. "If you had not received an offer from NCH, would you have remained employed at Physicians Regional?" A. "No." (M. Menichello Dep. 121:20-23; *see also* 120:14-121:23; Ex. 61);

> Bryan Murphey: "I was not going to stay after the changes that had been implemented by CHS. I had no plans of staying." Q. "Who caused you to leave Physicians Regional?" A. "CHS." (Murphey Dep. 160:1-3, 171:24-172:1; *see also* 130:16-172:4; Exs. 74, 129,144);

> Joseph Stafford: CHS "needed to make major improvement[s] in staff" to get him to stay (Stafford Dep. 88:7-10; *see also* 118:7-134:2; Exs. 75, 118);

> Carlos Portu: "I'm officially at the end of my rope." and "I was really worried that we were not doing a good job. And I just couldn't – I couldn't keep doing that to our patients." (Portu Dep. 139:11-24; *see also* 126:20-185:8; Exs. 58, 239-245);

> Paul Scott Rubinton: "I was left with no choice but to resign from Collier Blvd. HMA." (Rubinton Decl., ¶ 14; *see also* Rubinton Decl. generally);

<u>Natasha Choyah</u>: "So I was going to be leaving. I just didn't know whether it would be for another hospital job or McDonald's, but I was leaving." and "The only person that caused me to leave was Physicians Regional." (Choyah Dep. 54:4-10, 119:14-15; *see also* 104:14-120:2; Ex. 177).

Nothing Dr. Starr says will change the physicians' testimony. The facts are the facts, and Dr. Starr's opinions, incorporating these facts, have substantial probative value.

Finally, Dr. Starr opines that enforcing Plaintiffs' restrictive covenants in this particular case would "sever physician-patient relationships, lower the quality of medical care, lead to less access to medical care, and cause the prices of health care to rise in the community," and these are precisely the types of public policy exceptions contemplated by Florida Statute § 542.335. Dr. Starr's expert testimony will help the jury understand the factual evidence they will see and hear from the physicians and other witnesses in order to bridge the gap between this evidence and the public policy considerations that rendered the restrictive covenant unenforceable and that justified Defendants' actions.

<u>Conclusion</u>

For the forgoing reasons, Defendants respectfully ask this Court to deny Plaintiffs' Motion and permit the testimony and opinions of Dr. Evan Starr, in their entirety, and grant any further relief that this Court deems just and proper.

Respectfully submitted,

/s/  Kimberly D. Swanson
**Edward K. Cheffy (Trial Counsel)**
Florida Bar # 393649
ekcheffy@napleslaw.com
**Rachael S. Loukonen**
Florida Bar # 668435
rloukonen@napleslaw.com
**Kimberly D. Swanson**
Florida Bar #1018219
kdswanson@napleslaw.com
**Jonathan R. Fitzmaurice**
Florida Bar #1031248
jfitzmaurice@napleslaw.com
**CHEFFY PASSIDOMO, P.A**.
821 Fifth Avenue South, Suite 201
Naples, Florida 34102
(239) 261-9300 Telephone
(239) 261-9782 Fax
*Attorneys for Defendants NCH Healthcare System, Inc., Naples Community Hospital, Inc. and NCHMD, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on December 15, 2021, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to:

Alan D. Lash, Esq.
Emily L. Pincow, Esq.
Lash & Goldberg, LLP
Miami Tower, Suite 1200
100 Southeast Second Street
Miami, FL  33131
alash@lashgoldberg.com
epincow@lashgoldberg.com

/s/  Kimberly D. Swanson