UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

COLLIER HMA PHYSICIAN
MANAGEMENT, LLC and
NAPLES HMA, LLC, a Florida
limited liability company,

      Plaintiffs,

v.                                                        Case No.: 2:18-cv-408-SPC-MRM

NCH HEALTHCARE SYSTEM, INC.,
NAPLES COMMUNITY HOSPITAL,
INC. and NCHMD, INC.,

      Defendants.

_____/

## OPINION AND ORDER[1]

Before the Court are two motions for summary judgment.  First is Plaintiffs' Motion for Partial Summary Judgment (Doc. 194), along with Defendants' response (Doc. 202) and Plaintiffs' reply (Doc. 217).  Second is Defendants' Partial Motion for Summary Judgment (Doc. 188), together with Plaintiffs' response (Doc. 204) and Defendants' reply (Doc. 214).  Having considered the parties' papers against the record, the Court grants in part and

---

[1] Disclaimer: Documents hyperlinked to CM/ECF are subject to PACER fees.  By using hyperlinks, the Court does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide, nor does it have any agreements with them.  The Court is also not responsible for a hyperlink's availability and functionality, and a failed hyperlink does not affect this Order.

denies in part Plaintiffs' Motion and grants Defendants' Motion for the below reasons.[2]

## INTRODUCTION

This case is about a decade-long fight between two healthcare companies competing to employ the same doctors.  Plaintiffs claim Defendants poached seven of their physicians despite knowing their employment contracts prohibited them from joining Defendants for one year.  Defendants got the doctors to end their contracts with Plaintiffs early by offering them jobs and telling them the noncompete provisions in the contracts were unenforceable.  Defendants' scheme supposedly caused Plaintiffs to lose over forty million dollars.  To recoup the money, Plaintiffs now sue Defendants for tortious interference, conspiracy, and unfair competition.  That's the short story, but a longer version is needed to decide the pending motions.

## BACKGROUND

This case involves extensive briefing and exhibits.  Because the Court writes only for the parties (who are familiar with the facts), it only includes the undisputed facts necessary to explain the decision.[3]

---

[2] The Court had set an oral argument on the parties' Motions.  (Doc. 219; Doc. 221).  But after further reviewing the record, papers, and applicable case law, the Court sees such a hearing will be neither helpful nor productive to decide the issues raised.

[3] Unless noted otherwise, the facts are undisputed and based on each side's statements of material facts and responses.  (Doc. 188 at 6-14; Doc. 194 at 4-14; Doc. 202 at 3-10; Doc. 204 at 11-18).

Plaintiffs provide comprehensive and integrated medical care in southwest Florida.  They are Collier HMA Physician Management, LLC ("Collier") and Naples HMA, LLC ("Naples").[4]  Although separate legal entities, Collier and Naples operate in the same healthcare network.  Collier and non-party Collier Blvd. HMA Physician Management, LLC ("Boulevard") are the employment arms.[5]  Collier hires, pays, and retains the doctors.  Naples is the hospital arm, providing facilities, clinics, and other resources for doctors to treat their patients.  Also in the mix is non-party Community Health Systems, Inc. ("CHS"), who is the umbrella entity that oversees and coordinates Collier's and Naples' operations.

Plaintiffs and Defendants became direct competitors about ten years ago when Plaintiffs moved into southwest Florida's healthcare market.  Collier hired seven doctors between 2011 and 2013: Bryan Murphey, Joseph Stafford, Brian Menichello, Monica Menichello, Carlos Portu, Paul Rubinton, and Natasha Choyah ("Doctors").  The Doctors all signed employment contracts

---

[4] Plaintiffs are formally (1) Collier HMA Physician Management, LLC, d/b/a Physicians Regional Medical Group, and (2) Naples HMA, LLC, d/b/a Physicians Regional Healthcare System.  Throughout this case, Plaintiffs have been inconsistently referenced by different acronyms, short names, and titles.  For simplicity's sake, the Court calls each Plaintiff "Collier" and "Naples."

[5] For purposes of this Opinion and Order, the Court refers to Collier and Boulevard collectively as "Collier."

("Agreements") with Collier.  (Doc. 194-3).[6]  The Agreements are central to the motions, so details on the terms are needed for context.

All but one Agreement spanned three years.[7]  Even with the defined employment term, however, the Doctors could terminate the Agreements without cause by providing at least ninety days' written notice to Collier.  (Doc. 194-3 at 2, 6).

Under the Agreements, the Doctors kept control over their patients: "The employment relationship between you and us won't affect your physician-patient relationships.  You will exercise independent professional judgment in the treatment and care of your patients, and will always have exclusive control over decisions requiring medical judgment."  (Doc. 194-3 at 3).  In exchange, Collier kept control over the money the Doctors generated in treating their patients: "We will be responsible for billing, collecting and accounting for professional fees for your services.  We are also entitled to keep all of the professional fees that we collect."  (Doc. 194-3 at 3-4).

The Agreements also laid the groundwork on where the Doctors could practice medicine.  They could have medical staff membership only at hospitals with which Collier was affiliated.  (Doc. 194-3 at 2-3).  A nonaffiliated hospital

---

[6] When referencing the Agreements, this Opinion and Order cites only to Dr. Brian Menichello's Physician Employment Agreement.  (Doc. 194-3).  The others are substantively identical.  (Doc. 194-4; Doc. 194-5; Doc. 194-6; Doc. 194-7; Doc. 194-8; Doc. 194-9).

[7] Dr. Portu's term was one year.  (Doc. 194-8 at 4).

was possible but only with Collier's written consent, and if a patient preferred a different hospital or using an affiliated hospital wasn't in the patient's best interest.  (Doc. 194-3 at 3).

Central to the motions, the Agreements also included noncompete provisions that barred the Doctors from working for Defendants.  (Doc. 194-3 at 8, 18).  The provisions read,

> During the term of this Agreement, and for the 12-month period after this Agreement expires or is terminated, you won't have any financial relationship, including, without limitation, as an employee or independent contractor, with Naples Community Hospital, Inc. . . . nor any organization that directly or indirectly controls, is controlled by or is under common control with, Naples Community Hospital, Inc.[.]

(Doc. 194-3 at 18).

Only the Doctors and Collier signed the Agreements.  Naples was neither a signatory nor third-party beneficiary.  (Doc. 194-3 at 9 ("The terms and provisions of this Agreement are intended solely for the benefit of you and us. It is not the intention of the parties to confer third-party beneficiary rights upon any other person.")).  But Naples wasn't left out.  Under the Agreements, the Doctors agreed to practice medicine for Naples.  (Doc. 194-3 at 2).  They also promised to "do all other things reasonably in [their] power to promote, develop, and extend the business of" Naples.  (Doc. 194-3 at 2).

The Doctors worked steadily under their Agreements for some time until January 2014 when CHS acquired Plaintiffs' parent company.  After CHS took

over, some (if not all) Doctors voiced concerns about staff, new contracts, and work conditions.

The Doctors' discontent aligned with Defendants' longstanding physician recruitment efforts. Defendants had been actively recruiting local and out-of-town doctors since 2012—and some of Plaintiffs' established primary care physicians were among those considered. (Doc. 194-13 at 4). As early as 2013, Defendants were talking with Collier's doctors. And one doctor interested in working for Defendants gave them a copy of her employment contract that included the noncompete provision. (Doc. 194-14). This means that Defendants knew of Collier's standard noncompete provision in 2013.

When CHS acquired Plaintiffs' operations in 2014, Defendants believed a new legal defense surfaced to challenge the noncompete provisions. The defense was that the noncompete provisions were invalid under Florida law because they did not account for a successor entity, like CHS, to take over the Agreements. Although Defendants knew the defense was not a slam dunk, they thought a door may have opened to Collier's physicians. (Doc. 194-31). That's where Dr. Stafford enters.

On August 1, 2014, Defendants' attorneys had lunch with Dr. Stafford, who was interested in Defendants. At that time, Dr. Stafford was still working for Collier. Following the meeting, the attorneys updated Defendants' chief of staff:

6

> [We] met with Dr. Stafford today over lunch in order to meet him face-to-face and assess his character and credibility as a potential party/witness for the possible 'test case' with CHS.  [We] both liked him and felt he would be a great defendant to test the waters of CHS' resolve in enforcing the non-compete agreements. . .
>
> As requested, I planted the seed regarding him working in another practice, unaffiliated with NCH, as a "landing zone" should CHS sue and obtain a temporary injunction against his practicing with NCH for a year.  He seemed very receptive to the idea.
>
> I think at this juncture NCH should move ahead with its business planning with Dr. Stafford[.]

(Doc. 194-32 at 2).  So over the next few months, Defendants actively recruited Dr. Stafford and the other Doctors.  (Doc. 194-20; Doc. 194-21; Doc. 194-22).

In late 2014, most Doctors had given Collier their ninety days' notice of terminating their Agreements early without cause.  (Doc. 191-9, Exs. 110, 177, 244).  And one Doctor let his Agreement expire.  Although the parties sweat the details on why the Doctors jumped ship, it's generally undisputed that, before they left, Defendants promised them jobs and to pay any legal fees needed to fight their noncompete provisions.

Some Doctors called quickly on Defendants' promise.  (Doc. 194-33).  In December 2014, Plaintiffs separately sued five Doctors in state court for breaching the noncompete provisions and to block them from working for

Defendants.[8]  (Doc. 26-7).  The state court eventually let Defendant NCHMD, Inc. intervene (Doc. 26-8) and consolidated the cases.  Although Plaintiffs lost their bid for preliminary injunctive relief, they defeated Defendants' successor defense on appeal.  (Doc. 26-10).  The appellate court remanded the case for further proceedings.  But little has happened since.

Plaintiffs did not stop with suing some Doctors.  They also wanted to settle the score with Defendants here (in federal court) because primary care physicians are the underpinning of their network.  (Doc. 9).  Naples' chief executive officer testified as much:

> [W]ith any primary care physician, they're the foundation of everything within a healthcare system. They'll order test . . . whether that's lab, radiology, they'll refer to a specialist who ultimately will potentially do operating room procedures, they will admit patients to the hospital.
>
> So when NCH poached these physicians, there was a significant drain on total volume of patients of [sic] not only coming through the clinic and then also ultimately being referred to our specialists, but also utilizing the healthcare system as a whole, again, lab, radiology, physical therapy, the operating suites, ERs, that sort of thing.

(Doc. 194-10 at 289:22-290:12; *see also* Doc. 204 at 15 ("the relationships between primary care physicians and the PRMC Network generate substantial revenue for [Naples]").  Plaintiffs also "invested in [their] employed physicians

---

[8] The Court has taken judicial notice of most of the state court case.  (Doc. 44 at 6-7).

and developed contractual and business relationships with them, in large part because of the patient relationships that they cultivated and maintained for the hospital network as a whole." (Doc. 194 at 2). So when the Doctors left, they allegedly upended Plaintiffs' business model. Plaintiffs thus argue Defendants launched an intentional and unlawful scheme to steal revenues from them and to disrupt the integrity of Plaintiffs' health network.

To right Defendants' wrong, Plaintiffs now sue for $40.1 million in economic damages. This sum is allegedly the lost marginal profits from 19,231 patients who had once seen the Doctors. (Doc. 191-9, Ex. 342 at 24). The expert calculates Plaintiffs' damages by taking his one-year average of projected lost profits from patients ($4.01 million) and multiplying it by his "earnings before interest, taxes, depreciation, and amortization multiplier" of ten. (Doc. 191-9 at 472-75). To recover these damages, Plaintiffs bring four-tort based claims:

- tortious interference with contractual or advantageous business relationships against each Defendant (Counts I-III)[9]

- conspiracy to tortiously interfere with contractual or advantageous business relationships (Count IV)

- unfair competition (Count V)

---

[9] "[T]ortious interference with contract and tortious interference with a business relationship are basically the same cause of action. The only material difference appears to be that in one there is a contract and in the other there is only a business relationship." *Smith v. Ocean State Bank*, 335 So. 2d 641, 642 (Fla. 1st DCA 1976).

(Doc. 9).   These claims all hinge on the theory that Defendants unlawfully interfered with Plaintiffs' relationships with the Doctors (and, by extension, their patients) based on the Agreements and noncompete provisions.

Litigation has been contentious at every stage.   Defendants moved to dismiss an early complaint, which the Court largely denied.   (Doc. 44).[10] Defendants then answered, raising ten denials and eight affirmative defenses. (Doc. 47).   Discovery was fraught with motions, difficulties exchanging documents for experts, and status conferences.   Summary judgment has been no exception.   Plaintiffs move for partial summary judgment on seven denials and two affirmative defenses, and Defendants move for partial summary judgment on all claims asserted by Naples.   The parties have also filed three *Daubert* motions.   (Doc. 189; Doc. 192; Doc. 193).

## LEGAL STANDARDS

This is a diversity case.   And the parties agree that Florida's substantive law controls and Federal Rule of Civil Procedure 56 governs the burden for summary judgment.   *See Glob. Quest, LLC v. Horizon Yachts, Inc.*, 849 F.3d 1022, 1027 (11th Cir. 2017) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938)).

---

[10] The Court granted Defendants' motion only in that Naples has no claim for tortious interference with a contract or conspiracy to interfere with a contract because it was not a party or third-party beneficiary to the Agreements.   (Doc. 44 at 20).

"A party may move for summary judgment, identifying each claim or defense – or the part of each claim or defense – on which summary judgment is sought.  The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is material if it may "affect the outcome of the suit under the governing law."  *Id.*

For issues the movant bears the burden of proof, the "movant must affirmatively show the absence of a genuine issue of material fact, and support its motion with credible evidence demonstrating that no reasonable jury could find for the non-moving party on all of the essential elements of its case."  *Landolfi v. City of Melbourne, Fla.*, 515 F. App'x 832, 834 (11th Cir. 2012) (citation omitted).  But for issues the non-movant bears the burden, the movant has two options: (1) simply point out a lack of evidence to support the nonmoving party's case; or (2) provide "affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial."  *United States v. Four Parcels of Real Prop. in Green and Tuscaloosa Cntys.*, 941 F.2d 1428, 1437-38 (11th Cir. 1991) (citation omitted).  "The burden then shifts to the non-moving party, who must go beyond the pleadings and present

affirmative evidence to show that a genuine issue of material facts exists."

*Porter v. Ray*, 461 F.3d 1315, 1320 (11th Cir. 2006) (citation omitted).

At the summary judgment stage, courts view all facts and draw all reasonable inferences in the light most favorable to the nonmoving party. *Rojas v. Florida*, 285 F.3d 1339, 1341-42 (11th Cir. 2002). What's more, "[t]he court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). Against these standards, the Court turns to the summary judgment motions.

## DISCUSSION

### I.  Plaintiffs' Partial Motion for Summary Judgment

Plaintiffs seek summary judgment on Defendants' First, Second, Third, Fourth, Sixth, and Seventh Denials and Fifth and Sixth Affirmative Defenses. (Doc. 194); *see also Tingley Sys., Inc. v. HealthLink, Inc.*, 509 F. Supp. 2d 1209, 1218 (M.D. Fla. 2007) (noting partial summary judgment may be granted on affirmative defenses).

#### A. Denials

The Denials assert the noncompete provisions in the Agreements are "unlawful, void, and unenforceable" for various statutory and public policy reasons. (Doc. 47 at 9-12, 15). Without the noncompete provisions, Defendants assert Plaintiffs can maintain no claims for tortious interference, conspiracy, and unfair competition. Here are the Denials at issue:

- *First Denial*: enforcing the noncompete provision would contradict the public health, safety, and welfare per Fla. Stat. § 542.335(1)(g)(4)

- *Second Denial*: enforcing the noncompete provision would violate public policy by restraining ordinary competition, disrupting continuity of patient care in the community, and depriving the public of medical services.  Public policy considerations outweigh Plaintiffs' business interests per Fla. Stat. § 542.335(1)(i).

- *Third Denial*: no legitimate business interest supports the noncompete provisions per Fla. Stat. § 542.335(1)(b)

- *Fourth Denial*: the noncompete provision is not reasonably limited in time, geographic area, or line of business per Fla. Stat. § 542.335(1)

- *Sixth Denial*: the noncompete provision restrains trade per Fla. Sta. § 542.18.

- *Seventh Denial*: the noncompete provision was rendered unenforceable by Collier's prior material breach.

(Doc. 47 at 9-12).[11]

Before turning to the merits of Plaintiffs' arguments for summary judgment, the Court notes a procedural matter.  In their Answer, Defendants preface the Denials with the following statement:

> Defendants contend that in this matter there can be no tortious interference with a contract or business relationship, nor any unfair competition or civil conspiracy, if the [noncompete provision] was not valid and enforceable, and that for each theory of recovery Plaintiffs bear the burden of proving that the [noncompete provision] was valid and enforceable.  To the extent any Plaintiff does

---

[11] Defendants withdrew their Fifth Denial.  (Doc. 111 at 5-6).  And Plaintiffs do not move for summary judgment on the others.  (Doc. 47 at 13).

not bear such a burden of proof for any particular theory of recovery, denials one through seven below are asserted as affirmative defenses.

(Doc. 47 at 9).  In Plaintiffs' Motion, they say the Denials are "in actuality, affirmative defenses."  (Doc. 194 at 3).  Defendants don't dispute this point. Because the parties treat the Denials as affirmative defenses, the Court will too.

Plaintiffs argue the Denials cannot stand because Florida law does not require an enforceable contract to assert claims for tortious interference with contractual or business relationships.  Defendants disagree.  They argue, "[w]hen a contract is unlawful or contrary to public policy, the contract is *void ab initio* and a claim for tortious interference with that contract is not actionable."  (Doc. 202 at 12 (citing cases)).  From there, Defendants claim the noncompete provisions are void because they violate public policy and thus Plaintiffs cannot maintain a claim for tortious interference.  (Doc. 202 at 11-15).  To support their position, Defendants have hired Evan Starr, Ph.D. to opine on the negative effects the noncompete provisions have on the Doctors, the local community if enforced, and physicians in general.  (Doc. 192-1).

But the Court need not wade through the muddy waters the parties have created over the tortious interference claims.  It need not do so because Defendants' arguments don't align with how the Denials are pled.  The Denials focus entirely on the noncompete provisions—and not the Agreements as a

14

whole.  The Denials say the noncompete provisions—not the Agreements—are unlawful, void, and unenforceable.  This distinction matters because even if the noncompete provisions are void from the start as Defendants argue, the Agreements still stand because of their severability clauses.  (Doc. 194-3 at 10 ("The invalidity or unenforceability of any provision of this Agreement will not affect the validity or enforceability of any other provision.").  This means that the Agreements cannot be void from the start even if the noncompete provisions are unenforceable and void.  In the end, the Denials are immaterial because the tortious interference claims are based on the Agreements, not the noncompete provisions.  Plaintiffs can still argue and pursue damages for Defendants allegedly inducing the Doctors to terminate the Agreements early when Plaintiffs relied on them to finish or renew the Agreements.[12]  Because the tortious interference claims can proceed regardless of the Denials challenged, the Court grants Plaintiffs' Motion as to them.

Dismissing the Denials impacts the relevancy of Defendants' public policy expert, Dr. Starr.  Because the Denials are no longer in play, the Court will strike Dr. Starr's report.  (Doc. 192-1).  In doing so, the Court grants Plaintiffs' corresponding *Daubert* motion as to Dr. Starr.  (Doc. 192).

---

[12] To the extent that Defendants argue the validity of the noncompete provisions affect its Second and Third Affirmative defenses, neither side moved for summary judgment on them and neither side argues how dismissing the Denials will prevent Defendants from arguing those defenses later.  (Doc. 202 at 16-18).

## B. Fifth Affirmative Defense (mitigate damages)

The Fifth Affirmative Defense argues that Plaintiffs have failed to mitigate their damages. (Doc. 47 at 15). Plaintiffs move for summary judgment on this defense because "it was impossible for [Naples] to mitigate its damages under the circumstances" and Defendants have no record evidence to show otherwise. (Doc. 194 at 29). Plaintiffs say the Doctors took their patients with them, and once Defendants got the patients in their network, their referral restrictions on the Doctors made it "difficult if not impossible for them to return to" Plaintiffs. (*Id.*). Plaintiffs thus assert they had "no way to recapture that patient base or the revenue associated" with them. (*Id.*).

Defendants disagree. They argue "it is highly disputed in the record whether it was possible for Plaintiffs to mitigate their damages." (Doc. 202 at 29). Defendants point to the declaration of Kevin Cooper, the former Chief of Staff for Defendant Naples Community Hospital, Inc., who explains several ways Plaintiffs could have mitigated their damages. (Doc. 202-1 at 3-5). For example, Cooper says Plaintiffs could have "reach[ed] out to the departing physicians' patients to be sure they kn[e]w that there [were] physicians available and ready to serve them and following-up with those patients," and took "steps to maintain a positive relationship with the [departing] physician and encouraging him or her to continue making referrals." (*Id.* at 4).

Defendants also note they enforced no referral restrictions on the Doctors. (Doc. 30 at 36 (citing Doc. 194-12 at 140:6-12)).

The facts surrounding the mitigation affirmative defense are disputed and more appropriate for a jury to decide. Plaintiffs say Defendants have no evidence on mitigation, yet Defendants point to evidence in the record to support their affirmative defense. It is not for this Court to weigh Defendants' evidence and resolve credibility issues that the jury should decide as the factfinder. The Court simply cannot decide—as a matter of law—that Defendants have no evidence to support their defense. *See generally Perry v. Schumacher Grp. of La.*, No. 2:13-cv-36-FTM-JES-DNF, 2020 WL 6938391, at *4 (M.D. Fla. Nov. 25, 2020) (finding a jury must decide whether a plaintiff rejecting a job offer was reasonable given her obligation to mitigate her damages); *Degitz v. S. Mgmt. Servs., Inc.*, 996 F. Supp. 1451, 1463 (M.D. Fla. 1998) (concluding whether the plaintiff failed to mitigate damages were "more appropriate for a jury to decide"). The Court thus denies Plaintiffs' Motion as to the Fifth Affirmative Defense.

### C. Sixth Affirmative Defense (claim splitting)

For the Sixth Affirmative Defense, Defendants argue that Plaintiffs cannot maintain this suit because "advancing such claims [for tortious interference, conspiracy, and unfair competition] in this case and not in the state-court proceedings violates Florida's rule against claim splitting." (Doc.

47 at 15).  Defendants tested this defense at the motion to dismiss stage, arguing Plaintiffs engaged in impermissible claim splitting because this case and the state one involved largely the same parties and arose out of the same transaction.  The Court rejected that argument, and it does so again.

Florida's rule against splitting claims "prevent[s] a multiplicity of suits." *Bowman v. Coddington*, 517 F. App'x 683, 685 (11th Cir. 2013) (quotation marks omitted)).  "The law presumes that a single cause of action can be tried and determined in one suit, and will not permit the plaintiff to maintain more than one action against the same party for the same cause,' and 'if the first suit is effective and available, affords ample remedy to the plaintiff, the second suit is unnecessary[.]" *Id.* (quoting *Mims v. Reid*, 90 So. 2d 498, 501 (Fla. 1957)).

This case and the state case both stem from the Doctors jumping ship to Defendants.  But the similarity ends there.  The state case is a breach of contract dispute through which Plaintiffs want to enforce the noncompete provisions against the Doctors.  This action is a tort suit through which Plaintiffs blame Defendants for being the source of the Doctors leaving.  The state court case was filed years before this suit.  And the state cases were brought against some Doctors and only Defendant NCH intervened.

But, more important, if Plaintiffs win the state court case, it will not affect the outcome here.  That is because this case is not about the validity and enforceability of the noncompete provisions.  Defendants have tried to insert

such issues into this case through their Denials.  But the Court has rejected those Denials and taken them out of play.  The Court thus grants Plaintiffs' Motion as to the Sixth Affirmative Defense.

In conclusion, the Court grants in part and denies in part Plaintiffs' Partial Motion for Summary Judgment.  Plaintiffs are entitled to summary judgment on Defendants' Denials (1-4 & 6-7) and the Sixth Affirmative Defense.  But the motion is denied as to the Fifth Affirmative Defense.  The Court now moves to Defendants' motion.

## II. Defendants' Partial Motion for Summary Judgment as to Naples

Defendants move for summary judgment only on the claims Naples (and not Collier) brings against them.  Naples asserts that Defendants tortiously interfered with its business relationship with the Doctors (and, by extension, their patients), conspired to tortiously interfere, and competed unfairly. Because unfair competition is evaluated under Florida's law on tortious interference, and conspiracy requires proof of the interference, all counts at issue hinge on the tortious interference claim.  The Court thus starts there.

"Under Florida law, the elements of tortious interference with a business relationship are: (1) the existence of a business relationship that affords the plaintiff existing or prospective legal rights; (2) the defendant's knowledge of the business relationship; (3) the defendant's intentional and unjustified interference with the relationship; and (4) damage to the plaintiff.

*Int'l Sales & Servs., Inc. v. Austral Insulated Prods., Inc.*, 262 F.3d 1152, 1154 (11th Cir. 2001) (citing *Ethan Allen, Inc. v. Georgetown Manor, Inc.*, 647 So. 2d 812, 814 (Fla. 1994)).  Defendants challenge all but the second element.

The first element deeply divides the parties.  "A protected business relationship need not be evidenced by an enforceable contract." *Ethan Allen*, 647 So. 2d at 814 (citation omitted); *Waste Servs., Inc. v. Waste Mgmt., Inc.*, 283 F. App'x 702, 707 (11th Cir. 2008) (stating "the courts will recognize a protected business relationship even though the parties' relationship is based upon a contract that is void or unenforceable" (citation omitted)).  But "the alleged business relationship must afford the plaintiff existing or prospective legal or contractual rights." *Ethan Allen*, 647 So. 2d at 814 (quotation marks omitted).  A business relationship needs to be "evidenced by an actual and identifiable understanding or agreement which in all probability would have been completed if the defendant had not interfered." *Ethan Allen*, 647 So. 2d at 815; *see also Dunn v. Air Line Pilots Ass'n*, 193 F.3d 1185, 1191 (11th Cir. 1999) (stating a plaintiff must show "a relationship with a particular party, and not just a relationship with the general business community" to establish a cognizable business relationship).

Seminal to a tortious interference with a business relationship claim is the Florida Supreme Court's decision in *Ethan Allen v. Georgetown Manor, Inc.*, 647 So. 2d 812 (1994).  There, Ethan Allen supplied furniture for

Georgetown to sell.  When Georgetown stopped this relationship, Ethan Allen

placed a newspaper ad asking customers with unfilled orders with Georgetown

to contact its new stores.  Georgetown then sued Ethan Allen in federal court

because the ad tortiously interfered with its (1) business relationships with

customers who had existing orders; and (2) prospective relationships with

89,000 people who had once shopped at Georgetown and may return.

Georgetown won at trial.

On appeal, the Eleventh Circuit affirmed the jury award for existing

orders but asked the Florida Supreme Court to answer whether Georgetown

could recover for losing its goodwill with past customers.  In answering the

question, the court reasoned:

> Georgetown was entitled to the damages reasonably
> flowing from Ethan Allen's interference with its *existing*
> business relationships.  However, it is equally clear that
> Georgetown's relationship with its *past* customers was not
> one upon which a claim for tortious interference with a
> business relationship could be based.  Georgetown had no
> identifiable agreement with its past customers that they
> would return to Georgetown to purchase furniture in the
> future.  The mere hope that some of its past customers may
> choose to buy again cannot be the basis for a tortious
> inference claim.  Accordingly, Georgetown may not recover,
> in a tortious interference with a business relationship tort
> action, damages where the "relationship" is based on
> speculation regarding future sales to past customers.

*Ethan Allen*, 647 So. 2d at 815 (footnote omitted and emphasis added).

Defendants argue that *Ethan Allen* disposes of Naples' claims because

Naples is seeking damages for losing projected profits from 19,231 patients the

21

Doctors had once seen.  According to Defendants, Naples has no identifiable agreement with those patients that they would have returned to Naples but-for Defendants' interference.  And Naples offers only speculation that the patients may have come back.

Naples responds that Defendants cannot rely on *Ethan Allen* because its claims are based on its relationship with the Doctors—all of whom are named.  (Doc. 204 at 21-22).  From there, Naples says it had a business relationship with the Doctors because they referred their patients to Naples' facilities for treatment.  And Naples argues a physician-referral relationship can support a tortious interference claim under Florida law.  (Doc. 204 at 22 citing *Omni Healthcare, Inc. v. Health First, Inc.*, No. 6:13-cv-1509-RBD-DAB, 2016 WL 4272164, at \*25 (M.D. Fla. Aug. 13, 2016)).

In *Omni*, the district court reviewed three Florida appellate cases, which dealt with doctor-plaintiffs alleging doctor-defendants interfered with their relationships with other medical staff or hospitals who referred patients to them because of untrue statements or obstacles laid by defendants.  2016 WL 4272164, at \*25.  After discussing the state cases, the court summarily rejected the argument that business relationships relating to patient referrals are not cognizable.  *Id.*, at \*25-26.

Of the appellate cases *Omni* cited, only one came after *Ethan Allen* and warrants mention.[13]  In *Magre v. Charles*, 729 So. 2d 440 (Fla. 5th DCA 1999), the surgeon-defendant sent a defamatory letter to his colleagues criticizing the surgeon-plaintiff after his medical privileges were reinstated.  The plaintiff alleged the defendant intentionally interfered with his relationship with the hospital and other staff members who referred patients to him because the letter contained lies about him.  The appellate court found—with no explanation—that the letter may have unlawfully interfered with the plaintiff's business relationship with other doctors who refer patients to him.

So where does all this leave the Court?  Naples claims that its business relationship was with the Doctors and was based on their patient referrals.  But Defendants argue that Naples had no business relationship with the Doctors because (1) they were not signatories or third-party beneficiaries of the Agreements; and (2) they could not piggyback off Collier's contractual relationship with the Doctors just because Naples and Collier are affiliated companies in the same network.  They also assert that, although Naples alleges a business relationship with the Doctors, it seeks to recover damages based on its "*patient* relationships."  (Doc. 188 at 19 (emphasis original)).  And

---

[13] The other cases cited were *Greensberg v. Mount Sinai Med. Ctr. of Greater Miami, Inc.*, 629 So. 2d 252 (Fla. 3d DCA 1993) and *Scheller v. Am. Med. Int'l, Inc.*, 502 So. 2d 1268 (Fla. 4th DCA 1987).

a patient relationship doesn't fly, according to Defendants, because Naples had no understanding with the patients that they would have continued seeking medical treatment from Naples but-for Defendants interfering.  Here's how the Court lands:

Naples relies heavily on the patient referral to form the requisite business relationship.  It's undisputed the patient referral stems from Naples and the Doctors having operated in the same healthcare network.  To Naples, the network is enough to tie the Doctors to it for a business relationship.  So it strongly downplays the value of the Agreements.  It even harps that Florida law requires no contract for a tortious interference with a business relationship claim.  But what Naples misses is the Agreements are the sole reason the Doctors and Naples shared a network and referred their patients.  The Agreements pulled the Doctors into Plaintiffs' network and thus are Naples' only tie to the Doctors.

Without the Agreements, Naples could not rely on the Doctors to participate in Plaintiffs' network and refer their patients to it.  Nor could Naples count on the Doctors to maintain exclusive medical staff privileges and promote, develop, and extend Naples' business.  Without the Doctors practicing at Naples and making referrals as the Agreements required, Naples would have enjoyed little (if any) downstream revenues.  So although Florida law may

allow a plaintiff to assert a tortious interference with a business relationship claim where no enforceable contract exists, Naples is not that plaintiff.

Naples offers nothing to evidence its business relationship with the Doctors that isn't rooted in the Agreements. And in distancing itself from the Agreements, Naples loses sight it has no other "actual and identifiable understanding or agreement [with the Doctors] in which in all probability would have been completed if [Defendants] had not interfered." *Ethan Allen,* 647 So. 2d at 815. What all this means is Naples not being a signatory or third-party beneficiary to the Agreements matters to its ability to assert its tortious interference claim. *See, e.g., Plain Bay Sales, LLC v. Gallaher,* No. 9:18-cv-80581, 2019 WL 6206836, at *2-3 (S.D. Fla. Nov. 21, 2019) (finding third-party plaintiffs "lack[ed] standing to assert a claim for tortious interference with prospective business relationships" where they were not parties to the agreement or involved in their personal capacities with the sale of a racehorse).

And if Naples hasn't shown an identifiable understanding or agreement with the Doctors, they certainly have not gone the extra step to show one with the Doctors' patients. *See Maxi-Taxi of Fla., Inc. v. Lee Cnty. Port Auth.,* No. 2:07-CV-82-FTM-34SPC, 2008 WL 1925088, at *14 (M.D. Fla. Apr. 29, 2008), *aff'd,* 301 F. App'x 881 (11th Cir. 2008) ("[M]ere speculative hope that past customers will continue to avail themselves of the plaintiff's business

services does not provide a proper basis for a tortious interference claim."). So Naples cannot rely on the Doctors' patients to save its interference claim.

Even if Naples could show a business relationship with the Doctors, it still falls short on its burden. That's because Naples needs something more than some business relationship with the Doctors—it needs one on which it has some "existing or prospective legal or contractual rights." *Ethan Allen*, 647 So. 2d at 814 (quotation marks omitted). The record is undisputed that Naples has no contractual rights with the Doctors. That leaves only a possible legal right. Yet Naples articulates no such right, let alone offers evidence or authority to support one. *See MQ Assocs., Inc. v. N. Bay Imaging, LLC*, 270 F. App'x 761, 765-66 (11th Cir. 2008) ("[T]he claim against [defendants] for intentional interference with [plaintiff's] customer relationships was properly dismissed because [plaintiff] did not identify any legal rights at stake, and it did not allege any instances of customers not performing pursuant to those legal rights."); *Plain Bay*, 2019 WL 6206836, at *3 (dismissing a claim for tortious interference with other business relationship because the third-party plaintiffs had "no legal rights under any agreement or relationship relating to the sale of [the racehorse] that would give them standing to sue"). If Naples can present no business relationship with the Doctors on which it has legal rights, it's not the Court's job to scour the record to find one.

In conclusion, Naples offers no basis on which a reasonable jury could find it had a business relationship with the Doctors that afforded Naples existing or prospective legal rights.  Because Naples cannot do so, it cannot meet the first element of its tortious interference with a business relationship claim.[14]  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (stating summary judgment is required when a plaintiff fails to make a showing sufficient to establish a genuine issue of material fact as to the existence of an essential element of the claim).  The Court thus grants Defendants' motion to summary judgment and dismisses all Naples claims against them.

Dismissing Naples from this action likely impacts the damages Collier may recover on its own.  And Defendants' and Naples' experts calculated damages made based on both Collier and Naples being in this suit.  (Doc. 188 at 14; Doc. 204 at 18).  With Naples now out, Collier and Defendants will likely need to recalculate the purported damages.  The Court thus strikes the expert reports on damages from Scott Phillips and Dr. John Gale and denies without prejudice the corresponding *Daubert* motions.

One final matter.  Defendants seek summary judgment on Plaintiffs' claims for attorney's fees.  Plaintiffs respond they are not pursuing such fees.

---

[14] The Court need not address Defendants' other arguments on proximate cause and qualified privilege, which go to the other elements of Naples' tortious interference with a business relationship claim.

Because of Plaintiffs' response, the Court too grants Defendants' summary judgment on this argument.

## III.   Conclusion

For the above reasons, the Court grants in part and denies in part Plaintiffs' motion and grants Defendants' entire motion.  The Court also strikes the expert reports that each side has offered as moot under this Opinion and Order.  But it may consider allowing Collier and Defendants time to amend their expert reports on damages now that Naples is gone.  What remains of this action is Collier's claims for tortious interference with a contractual relationship, conspiracy to commit tortious interference with a contractual relationship, and unfair competition.  Given the new substantive posture, the Court finds good reason to refer the remaining parties to a settlement conference with a non-assigned Magistrate Judge before trial.

Accordingly, it is

**ORDERED:**

1. Plaintiffs' Motion for Partial Summary Judgment (Doc. 194) is **GRANTED in part and DENIED in part**.

    a. Plaintiffs are entitled to judgment as a matter of law on Defendants' First, Second, Third, Fourth, Sixth, and Seventh Denials and Sixth Affirmative Defense.

      b.  Plaintiffs' Motion to Exclude the Opinions of Expert Evan Starr,

          Ph.D. (Doc. 192) is **GRANTED**.

2. Defendants' Partial Motion for Summary Judgment (Doc. 188) is

   **GRANTED**.  Defendant is entitled to judgment as a matter of law on

   Plaintiffs Naples HMA, LLC's claims against it.

      a.  The reports, testimony, and opinions of Scott K. Phillips are

          **STRICKEN** and Defendants' related *Daubert* motion (Doc.

          189) is **DENIED without prejudice**.

      b.  The reports, testimony, and opinions of Dr. John M. Gale are

          **STRICKEN** and Plaintiffs' related *Daubert* motion (Doc. 193)

          is **DENIED without prejudice**.

3. The Court **REFERS** this case to United States Magistrate Judge

   Douglas N. Frazier for a settlement conference.  The parties must

   contact Judge Frazier's Chambers (239-461-2052) to schedule the

   conference.

4. The Court **CANCELS** the oral argument set for March 14, 2022, and

   **SETS** a Zoom status conference for **March 22, 2022 at 1:30 p.m.**

   where the parties should be prepared to discuss expert reports, the

   settlement conference with Judge Frazier, new pretrial deadlines,

   and a trial date for this summer.

a. The Clerk is **DIRECTED** to issue a notice of hearing under separate cover.

**DONE and ORDER** in Fort Myers, Florida on March  11, 2022.

SHERI POLSTER CHAPPELL
UNITED STATES DISTRICT JUDGE

Copies:      United States Magistrate Judge Douglas N. Frazier
             All parties of record

30